# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| RICHARD KAGAN, | : | |
| Individually and as Trustee *Ad Litem*, | : | |
|    Plaintiff, | : | |
|  | : | |
|       v. | : | CIVIL ACTION |
|  | : | |
| HARLEY DAVIDSON, INC., | : | NO. 07-0694 |
| A/K/A HARLEY-DAVIDSON MOTOR CO., INC., | : | |
| HARLEY-DAVIDSON MOTOR COMPANY | : | |
| GROUP, INC., | : | |
| BUELL MOTORCYCLE COMPANY, | : | |
|    Defendant. | : | |

## Memorandum and Order

YOHN, J.                                                                    April ____, 2008

     Plaintiff Richard Kagan, individually and as Trustee *Ad Litem*, brings this products

liability lawsuit against defendant Harley Davidson, Inc., asserting claims of strict liability,

negligence, breach of express and implied warranties, and wrongful death in connection with the

death of his wife.  Harley Davidson has filed counterclaims for negligence and negligence per se.

Presently before the court is Harley Davidson's motion for summary judgment pursuant to

Federal Rule of Civil Procedure 56 as to Kagan's claims.  For the reasons discussed herein, the

court will grant Harley Davidson's motion as to Kagan's breach of warranty claims and will

order supplemental briefing on the strict liability and negligence claims before ruling on the

remaining claims.[1]

## I.      Factual and Procedural Background[2]

This case arises from a June 26, 2004 accident involving Kagan's 1995 Harley Davidson Sportster.  Kagan's lawsuit is based on the theory that Harley Davidson defectively and negligently designed and manufactured the kickstand on his motorcycle because it did not incorporate a Side Stand Interlock System ("SSIS") that would have shut off the motorcycle's engine if the kickstand released during the motorcycle's operation.[3]  At some point prior to the accident, the spring in Kagan's kickstand became deformed, preventing it from fully retracting. Because the kickstand did not fully retract, it may have released and hit the roadway immediately before the accident.  Kagan asserts that if Harley Davidson would have designed and manufactured the motorcycle with an SSIS, the engine would have shut off when the kickstand

---

[1] Kagan's wrongful death claim is derivative of the tortious act that would have supported his wife's own cause of action.  *See Grbac v. Reading Fair Co.*, 688 F.2d 215, 217 (3d Cir. 1982); *Moyer v. Rubright*, 651 A.2d 1139, 1142-43 (Pa. Super. Ct. 1994).  Kagan's strict liability and negligence claims are based on the same accident that resulted in his wife's death; thus, had his wife survived, her strict liability and negligence claims against Harley Davidson would be the same as Kagan's.  Accordingly, the wrongful death claim will survive summary judgment only if Kagan's strict liability claim or negligence claim survives summary judgment.

[2] The account contained in this section is comprised of both undisputed facts and Kagan's factual allegations, and all facts and inferences are viewed in the light most favorable to Kagan, the nonmoving party.  *See Brown v. Muhlenberg Twp.*, 269 F.3d 205, 208 (3d Cir. 2001) (citing *Beers-Capitol v. Whetzel*, 256 F.3d 120, 130 n.6 (3d Cir. 2001)).

[3] The parties' documents interchangeably use the terms "kickstand," "side stand," and "jiffy stand."  To be consistent, I will refer to the mechanism as the "kickstand."
     The kickstand is comprised of a bracket or yoke, a kickstand leg, and a spring.  When the motorcycle is in operation, the spring holds the kickstand leg in the fully retracted (up) position, flush against the motorcycle's rubber bumper.  When the motorcycle is not in operation, the kickstand is placed in the fully deployed (down) position and holds the motorcycle upright.  The kickstand is designed to move easily rearward and upward toward the fully retracted position when the weight of the motorcycle is not resting on the stand.

was partially deployed, he would have become immediately aware of it, and the accident would not have occurred.

## A.   Background Information

Kagan bought the 1995 Harley Davidson Sportster from his wife's son and his stepson, Adam Martin, in May or June 2004.  (Dep. of Richard K. Kagan 175:17-176:14, July 17, 2007; Dep. of Adam Martin 21:6-25, Aug. 16, 2007.)[4]  Kagan had not seen or driven the motorcycle before he purchased it from Martin.  (Kagan Dep. 189:21-190:19.)  Martin gave Kagan a service manual when he delivered the motorcycle to Kagan, but Kagan did not read the manual.  (*Id.* at 207:1-20, 179:8-12.)  The service manual contained a section on how to care for the motorcycle's kickstand and included the following warning:

> Be sure jiffy stand is fully retracted before riding.  If jiffy stand is not fully retracted during vehicle operation, unexpected contact with the road surface can distract the rider.  While the jiffy stand will retract upon contact, the momentary disturbance and/or rider distraction can lead to loss of vehicle control resulting in personal injury and/or vehicle damage.

(D. Mot. for Summ. J. Ex. C.)  Martin did not give Kagan a copy of the motorcycle's owner's manual, and Kagan did not attempt to obtain one.  (Kagan Dep. 179:21-23, 180:18-24.)

The motorcycle was in the same condition on the day of the accident as it was on the day

---

[4] The parties dispute the date on which Kagan bought the motorcycle from Martin. Kagan testified in his deposition that he bought the motorcycle on or about June 16, 2004. (Kagan Dep. 175:2-23; *see also* Def. Undisputed Facts ¶ 1; Def. Resp. to Pl. Statement of Facts ¶ 3.)  Martin testified in his deposition that he sold the motorcycle to Kagan on or about May 22, 2004.  (Martin Dep. 21:8-23; *see also* Pl. Statement of Facts ¶ 2.)  Both parties provided the court with a copy of the title, but the only discernable date on the title is May 28, 2004, a date neither party referred to in the briefs.  (*See* Def. Mot. for Summ. J. Ex. E; Pl. Mem. in Opp'n to Summ. J. Ex. E.)  For purposes of the arguments addressed in this motion, the exact date of sale is not relevant; it is important that Kagan bought the motorcycle from Martin prior to the date of the accident, and neither party disputes this fact.

Martin delivered it to Kagan.  (*Id.* at 201:14-18.)  When Kagan bought the motorcycle, he was not aware of a switch being available that would have shut off the engine if the kickstand partially or fully deployed.  (*Id.* at 247:6-248:1.)  Kagan did not inspect the kickstand to determine its condition prior to the accident, and he did not know that the spring on the kickstand was deformed or that the kickstand sagged down.  (*Id.* at 204:1-21, 359:8-360:8)  Furthermore, he could not see the kickstand when he was seated on the motorcycle, so he did not know whether it sagged, or deployed partially, while he was driving the motorcycle.  (*Id.* at 361:23-362:5.)

### B.     The Accident

On June 26, 2004, Kagan lost control of the motorcycle while negotiating a curve to the left, the motorcycle left the roadway, and Kagan and his wife were thrown from the motorcycle. (Pl. Statement of Facts ¶ 30; Def. Resp. to Pl. Statement of Facts ¶ 30.)  Kagan suffered serious injuries from the accident, and his wife died from the injuries she sustained.  (Pl. Statement of Facts ¶ 30; Def. Resp. to Pl. Statement of Facts ¶ 30.)

The day of the accident, Kagan and his wife rode the motorcycle from their house in Norristown, Pennsylvania to his house in Montgomeryville, Pennsylvania.  (Kagan Dep. 250:12-22, 254:22-256:24.)  Kagan and his wife stopped at Kagan's house in Montgomeryville and then left to visit Kagan's mother-in-law in Lancaster, Pennsylvania.  (*Id.* at 257:21-258:7, 359:3-8.) When traveling from Montgomeryville to Lancaster, Kagan would typically travel on Highway 202 to Route 30, and then take Route 30 to Route 10, after which he would drive on back roads to his mother-in-law's house.  (*Id.* at 262:23-10.)  The last thing Kagan remembers from the day of the accident is making a right-hand turn from Route 30 on to Route 10.  (*Id.* at 266:2-16,

4

288:1-12.)  He does not know what caused him to lose control of the motorcycle on Route 10,

and he has no recollection of whether the kickstand touched the roadway prior to the accident.

(*Id.* at 297:3-10.)

Matthew and Julianna Fuellner were traveling directly behind Kagan at the time of the

accident.  (Dep. of Julianna Fuellner 33:16-22, Sept. 19, 2007.)  The Fuellners first observed

Kagan and his wife on the motorcycle when Kagan made a left-hand turn on to Route 10 from a

gas station.  (*Id.* at 33:1-24, 37:2-22.)  Prior to the accident, the Fuellners observed that the

kickstand was hanging down approximately three-quarters of the way off the motorcycle.  (J.

Fuellner Dep. 43:18-24, 60:13-14; Dep. of Matthew Fuellner 25:4-7, Sept. 19, 2007.)  Mrs.

Fuellner initially testified in her deposition that she saw the kickstand contact the roadway during

the accident.  (J. Fuellner Dep. 9:10-15.)  However, at two later times during the deposition, she

testified that she did not observe the kickstand contact the roadway.  (*Id.* at 54:21-22, 60:5-9.)

Mr. Fuellner testified that he did not see the kickstand contact the roadway.  (M. Fuellner Dep.

25:10-15.)  While speaking with an officer at the scene, Mr. Fuellner observed a gouge in the

highway at the location where the motorcycle first started to leave the highway.  (*Id.* at 12:7-15.)

### C.   Kagan's Expert Witness

Scott King, Kagan's expert witness, determined that the kickstand spring was deformed

prior to the June 26, 2004 accident.  (Dep. of R. Scott King 141:13-16, 347:10-21, Oct. 22,

2007.)  He believed that the motorcycle had not originally been equipped with a deformed spring.

(*Id.* at 340:7-10, 340:18-23.)  King concluded that the deformed spring prevented the kickstand

from fully retracting, and if the spring had not been deformed, the kickstand would have fully

retracted.  (*Id.* at 141:17-142:11.)  King tested the operation of the kickstand and concluded that

5

other than the sagging due to the deformed spring, the kickstand operated correctly.  (*Id.* at 198:7-199:2.)  He did not consider the spring's design or components to be defective.  (*Id.* at 340:11-17.)

Based on the Fuellners' statements and the evidence of scraping on the tip of the kickstand,[5] King determined that Kagan's kickstand came into contact with the ground during the accident.  (*Id.* at 142:12-143:6.)  He further determined that if the spring had not been deformed, the kickstand would not have touched the ground.  (*Id.* at 143:7-13.)

King concluded that the kickstand contacting the roadway was a contributing factor to the accident.  (*Id.* at 143:14-21.)  He also concluded that the absence of a cut-off switch (or SSIS) was another contributing factor to the accident.  (*Id.* at 405:17-12.)  The absence of an SSIS contributed to the accident because it if had been in place, it would have sensed the sagging kickstand and would have "notified" Kagan that there was a problem with the motorcycle (i.e., the SSIS would have turned off the engine).  (*Id.* at 406:6-12.)  King opined that any motorcycle made from 1995 onward that did not have an engine cut-off switch, or SSIS, associated with the kickstand is a defective product.  (*Id.* at 139:16-140:2, 385:13-21.)  He explained that he considers a motorcycle without the SSIS to be a defective product because of the risk of crash, loss of control, or injury that could occur if the kickstand contacts the ground during the

---

[5] King could not say with a reasonable degree of scientific certainty that all of the scratches on the kickstand actually came from the kickstand contacting the roadway during the motorcycle's operation.  (King Dep. 256:13-19.)  He also did not know whether the scratches on the kickstand were produced the day of the accident or prior to the accident.  (*Id.* at 255:21-256:12.)  However, the type of scratches on the kickstand were consistent with the scratches that are produced when the kickstand contacts the roadway.  (*Id.* at 252:2-10.)

motorcycle's operation.  (*Id.* at 140:3-5.)[6]

King noted, however, that there would not necessarily be an accident or loss of control and the driver may not even notice every time the kickstand contacts the roadway.  (*Id.* at 140:6-20, 327:17-20.)  He also testified that, assuming the kickstand hit the ground on the day of Kagan's accident, it was possible that this did not cause the accident.  (*Id.* at 327:5-20.)

### D.    Harley Davidson's Expert Witness

Thomas Carter, Harley Davidson's expert, examined Kagan's motorcycle and concluded that the kickstand retraction mechanism functioned properly, but the kickstand did not retract fully; it retracted to approximately three-fourths of an inch from the motorcycle's rubber bumper. (Def. Reply Ex. P, Report of Thomas Carter ¶¶ 60.50.6, 60.50.10, Sept. 10, 2007.)  This resulted in a seven-degree angle between the bumper and the kickstand.  (*Id.* ¶ 60.50.6.)  Based on the damage patterns and the location of the damage, Carter concluded that the damage to the kickstand's spring occurred prior to Kagan's accident.  (*Id.* ¶ 6.52.)

Carter explained that the kickstand's partial deployment, or sagging, would only cause a disturbance when it touched the ground if there was a binding system on the kickstand that did not allow the kickstand to retract.  (Dep. of Thomas J. Carter 78:2-24, Dec. 19, 2007.)  If the kickstand were freely moving, however, it would move away from the ground upon contact.  (*Id.* at 78:8-9.)  He explained that the kickstand installed on Kagan's motorcycle was a weight-

---

[6] To support his theory that Harley Davidson was aware that it could have designed a motorcycle in 1995 with the SSIS technology, Kagan included documents showing that Harley Davidson employees had discussed the feasability of implementing the SSIS technology into its motorcycles and had conducted an economic analysis to determine the cost of including such a system.  (*See* Pl. Mem. in Opp'n to Summ. J. Ex. J.)  Some of the documents, however, pertain to the 1998 model year; thus, it is not clear how they are relevant to the design of Kagan's model year 1995 Sportster.

bearing stand designed to automatically retract when it contacted the pavement and there was no problem with the kickstand's retraction.  (*Id.* at 69:8-13, 78:24-79:2.)

Carter testified that an SSIS is typically installed to prevent drivers from riding away with the kickstand fully deployed or to prevent the motorcycle's operation when the kickstand is deployed near the center point, when the kickstand's contact with the roadway would impart a force to the motorcycle.  (*Id.* at 77:11-23.)  He also explained that the Harley Davidson kickstand design already included a safety feature.  (*Id.* at 79:24-80:12.)  It has one of the best retraction mechanisms available because it is a weight-bearing stand, and once the weight is removed from the kickstand, it requires very little effort for the kickstand to fold.  (*Id.* at 80:20-80:4.)  There is no force preventing the kickstand from retracting, and it is almost an automatically folding stand. (*Id.* at 81:1-4.)  Furthermore, because it is a weight-bearing stand, there are no problems with operators driving away with the kickstand deployed.  (*Id.* at 80:22-24.)

Carter also concluded that the deformed spring in Kagan's motorcycle sometimes caused the kickstand to contact the ground during left turns.  (*Id.* at 102:9-15.)  According to Carter, this contact did not cause any disturbance to the motorcycle or the operator.  (*Id.* at 102:16-103:4.) He also determined that the kickstand may have contacted the roadway while Kagan was navigating the curve immediately prior to the accident, but there was no evidence that this impact imparted a force to the motorcycle.  (*Id.* at 60:22-61:8.)

## II.    **Legal Standard**

Either party to a lawsuit may file a motion for summary judgment, and it will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996) (citation omitted). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Furthermore, "[a]ll justifiable inferences are to be drawn in [the nonmovant's] favor." *Id*. "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy*, 90 F.3d at 744 (citation omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) (citation omitted). The nonmovant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production; the nonmovant must present concrete evidence supporting each essential element of its claim. *Anderson*, 477 U.S. at 252; *Celotex*, 477 U.S. at 322-23.

9

## III.   Discussion

### A.     Strict Liability Claim

In Count I, Kagan brings a claim for strict liability against Harley Davidson.  He argues that Harley Davidson defectively designed and manufactured the motorcycle because the kickstand's design did not include an SSIS and that this design defect rendered the motorcycle unreasonably dangerous for its intended use.[7]

Neither party disputes that Pennsylvania law governs this diversity case.  Pennsylvania adopted section 402A of the Second Restatement of Torts[8] regarding products liability in 1966.  *See Webb v. Zern*, 220 A.2d 853, 854 (1966).  Under Pennsylvania law, a plaintiff may bring a strict liability claim premised on the theory that the product was defectively designed.  *Azzarello v. Black Bros. Co.*, 391 A.2d 1020, 1022 (Pa. 1978).  To prevail on such a claim, "the plaintiff must prove (1) that the product was defective, (2) that the defect existed when it left the hands of the defendant, and (3) that the defect caused the harm."  *Riley v. Warren Mfg., Inc.*, 688 A.2d 221, 224 (Pa. Super. Ct. 1997) (citing *Ellis v. Chi. Bridge & Iron Co.*, 545 A.2d 906, 909 (Pa.

---

[7] Although Kagan's Complaint included a claim for a manufacturing defect, neither party has briefed or argued the issue.  The court would employ the same risk-utility analysis discussed below to both types of claims.  *See Lancenese v. Vanderlans & Sons, Inc.*, No. 05-5951, 2007 WL 1521121, at *2-3 (E.D. Pa. May 21, 2007).

[8] The relevant provision of Section 402A provides:
> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm thereby caused to the ultimate user or consumer . . . , if
>> (a) the seller is engaged in the business of selling such a product, and
>> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

10

Super. Ct. 1988)).[9]

In Pennsylvania, the threshold determination in strict liability claims for defective design is whether the product is "unreasonably dangerous" as a matter of law. *Moyer v. United Dominion Indus., Inc.*, 473 F.3d 532, 538 (3d Cir. 2007); *Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1042 (3d Cir. 1997); *Riley*, 688 A.2d at 224; *Azzarello*, 391 A.2d at 1026. Making the threshold determination of whether a product is unreasonably dangerous requires the judge to "engage in a risk-utility analysis, weighing a product's harms against its social utility." *Surace*, 111 F.3d at 1044. It addresses the question of "whether a product's condition justifies placing the risk of loss on the supplier." *Id.* at 1042. Pennsylvania courts and the Third Circuit have identified seven factors that judges can consider when engaging in this analysis:

> (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole; (2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury; (3) The availability of a substitute product which would meet the same need and not be as unsafe; (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) The user's ability to avoid danger by the exercise of care in the use of the product; (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instruction; and, (7) The feasibility, on the part of the manufacturer, of spreading the loss of [sic] setting the price of the product or carrying liability insurance.

*Id.* at 1046 (quoting *Dambacher v. Mallis*, 485 A.2d 408, 423 n.5 (Pa. Super. Ct. 1984)); *see also, e.g.*, *Makadju v. GPI Div. of Harmony Enters.*, No. 05-3044, 2007 WL 1521221, at *2-4 (E.D. Pa. May 23, 2007); *Lancenese*, 2007 WL 1521121, at *2-5; *Warnick v. NMC-Wollard, Inc.*,

---

[9] Throughout its arguments on the strict liability and negligence claims, Harley Davidson focuses on the deformed kickstand spring as the defect at issue. However, given Kagan's theory of liability, the alleged defect at issue is actually the absence of the SSIS technology; therefore, large portions of defendant's arguments are irrelevant.

512 F. Supp. 2d 318, 324-29 (W.D. Pa. 2007); *Riley*, 688 A.2d at 224-25.  The judge determines whether a product is unreasonably dangerous "under a weighted view of the evidence, considering the facts in the light most favorable to the plaintiff."  *Moyer*, 473 F.3d at 538 (citing *Phillips v. A-Best Prod. Co*, 665 A.2d 1167, 1171 n.5 (Pa. 1995)).

"If the judge concludes that a product is 'unreasonably dangerous' the case is submitted to the jury, which then decides, based on all the evidence presented, 'whether the facts of the case support the averments of the complaint.'"  *Moyer*, 473 F.3d at 538 (quoting *Azzarello*, 391 A.2d at 1026).  "[T]he jury does not balance the risk-utility factors . . . . Instead, the jury considers whether the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use."  *Id.* at 532 (internal quotation marks and citations omitted).

Accordingly, the appropriate question to consider first is whether the product is unreasonably dangerous as a matter of law.  *See Surace*, 111 F.3d at 1049 n.10.  In its memorandum of law in support of its motion for summary judgment, Harley Davidson did not address the issue of whether the 1995 Harley Davidson that was designed without the SSIS technology is unreasonably dangerous.  Harley Davidson only briefly addressed this issue in its reply brief, and its three sentence conclusory argument regarding this issue does not provide sufficient evidence for the court to make a determination of whether the motorcycle is unreasonably dangerous without the SSIS technology.[10]  Additionally, although Kagan listed the

---

[10] Harley Davidson cannot be strictly liable for a defective product if it was not used in a manner in which Harley Davidson intended it to be used.  *See Azzarello*, 391 A.2d at 1027.  Thus, Harley Davidson argues that it is entitled to summary judgment because Kagan's use of the motorcycle with a deformed spring in the kickstand was not an intended use of the motorcycle.  However, Harley Davidson does not point to any authority to support this proposition; rather, it

factors that can be considered when determining whether the motorcycle is unreasonably

dangerous, he did not point to evidence to support his theory that the motorcycle is unreasonably

dangerous without the SSIS technology.

The Third Circuit has recently clarified that judges must make the threshold

determination of whether the product at issue is unreasonably dangerous *prior* to trial.  *Moyer*,

473 F.3d at 538; *see also Makadju*, 2007 WL 1521221, at *1.  Because the parties have not

addressed whether the 1995 Harley Davidson Sportster is unreasonably dangerous without the

SSIS technology, I will order the parties to provide supplemental briefing on this issue.  Harley

Davidson will have fourteen days from the date of the Order accompanying this Memorandum to

provide supplemental briefing on the issue of whether Kagan's 1995 Harley Sportster, which did

not contain the SSIS technology, is unreasonably dangerous.[11]  Kagan will then have fourteen

---

says that this is purely a matter of common sense.  According to the Third Circuit's interpretation
of Pennsylvania law, which I must rely on, "[u]nless the use giving rise to a strict liability cause
of action is a reasonably obvious misuse, or the user a reasonably obvious unintended user . . . or
unless the particular use or user is clearly warned against, the manufacturer is not obviously
exonerated."  *Metzgar v. Playskool Inc.*, 30 F.3d 459, 465 (3d Cir. 1994).  I cannot conclude that
using a motorcycle with a deformed spring in the kickstand is such a reasonably obvious misuse
of the motorcycle that it would automatically bar Kagan's strict liability claim.

The remainder of Harley Davidson's arguments regarding why it is entitled to summary
judgment—e.g., that the lack of SSIS technology did not cause the accident and that Kagan
cannot prove that the motorcycle was defective when it left Harley Davidson's control—pertain
to the second and third elements.  Because the issue of whether a product is unreasonably
dangerous pertains to the first element, and because this is the threshold determination to be
made by the trial judge, s*ee Surace*, 111 F.3d at 1053, 1044-45, I will not address the remainder
of Harley Davidson's arguments at this time.

[11] In its reply brief, Harley Davidson noted that the kickstand on Kagan's motorcycle
sagged down at a seven-degree angle, and Kagan's documents only identify an SSIS that
activates when the kickstand is deployed at a twenty- or twenty-five-degree angle.  Therefore,
Harley Davidson argues that it is entitled to summary judgment on Kagan's strict liability claim
because even if Kagan's 1995 Harley Davidson Sportster had contained the SSIS technology,
Kagan could not prove that it would have prevented his accident.  If Harley Davidson is relying

days from the date Harley Davidson files its supplemental brief to file a responsive brief on the

issue.[12]

### B.      Negligence Claim

In Count II, Kagan alleges that Harley Davidson was negligent because it failed to (1)

discover the defect in the motorcycle, even though it knew or should have known that the defect

existed; (2) take steps to repair the defective motorcycle; (3) properly test the motorcycle; and (4)

incorporate the SSIS technology into Kagan's motorcycle.[13]

Pennsylvania law requires a plaintiff to establish the following in order to prevail on a

cause of action alleging negligence:

> (1) a duty or obligation recognized by the law, requiring the actor to conform to a
> certain standard of conduct; (2) a failure to conform to the standard required; (3) a
> causal connection between the conduct and the resulting injury; and (4) actual loss
> or damage resulting to the interests of another.

*Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1366 (3d Cir. 1993) (citing *Morena v. S. Hills*

*Health Sys.*, 462 A.2d 680, 684 n.5 (Pa. 1983)).   The primary element to consider is the duty of

---

on this theory as a basis for summary judgment, then it must fully brief the issue in its
supplemental briefing (noting, however, the testimony of the Fuellners, which contradicts
Carter's factual assertions concerning the amount of the "sag").

[12] Strict liability and negligence are distinct theories, *see Phillips v. Cricket Lighters*, 841
A.2d 1000, 1008 (Pa. 2003), and under current Pennsylvania law, negligence concepts are not to
be considered when determining strict liability, *see Habecker v. Clark Equip. Co.*, 36 F.3d 278,
282 (3d Cir. 1994) (citing *Lewis v. Coffing Hoist Div., Duff-Norton*, 528 A.2d 590, 593 (Pa.
1987)).  As a court sitting in diversity, I am bound to apply Pennsylvania law and the Third
Circuit's interpretation of Pennsylvania law, which currently require separation of strict liability
and negligence under the Second Restatement of Torts.  Thus, I caution the parties to avoid
merging these concepts in their supplemental briefs.

[13] Kagan has not argued the first three allegations of negligence and is apparently not
pursuing them.

14

care the defendant owed to the plaintiff.  *Phillips*, 841 A.2d at 1008 (citing *Althaus v. Cohen*, A.2d 1166, 1168 (2000)).  This determination is a question of law.  *Kleinknecht*, 989 F.2d at 1366; *R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005).

Harley Davidson argues that it is entitled to summary judgment on Kagan's negligence claim because it did not have a duty to design a motorcycle with parts that would not wear out or break.  This argument refers to the deformed spring, not to the design of the motorcycle or the incorporation of the SSIS technology, and is not the relevant to the duty alleged here by Kagan.[14] Kagan responds that Harley Davidson had a general duty to use care in the design of its products, a theory of negligence that was not specifically mentioned in Kagan's complaint.[15]  Thus, it is unclear whether Kagan is asserting that (1) Harley Davidson was negligent because it had a duty to exercise reasonable care to design and manufacture a reasonably safe motorcycle and breached this duty, causing his accident; or (2) Harley Davidson was negligent because it had a duty to design and manufacture a motorcycle in 1995 that contained the SSIS technology and breached this duty, causing his accident.

---

[14] To support its argument that it had no duty to Kagan under this theory, Harley Davidson relies on *Kaczmarek v. Mesta Machine Co.*, 463 F.2d 675 (3d Cir. 1972), and *Abdul-Warith v. Arthur G. McKee & Co.*, 488 F. Supp. 306 (E.D. Pa. 1980).  However, neither of these two cases actually included negligence causes of action; therefore, they are not applicable to Kagan's negligence claim.

[15] Kagan also argues that a jury could determine that the failure to include the SSIS technology in the motorcycle was negligent because Harley Davidson was aware of the dangers associated with operating a motorcycle with a kickstand that was not fully retracted.  (*See* Def. Mot. for Summ. J. Ex. C, at 2-64 (factory manual warning owners of 1995 Harley Davidson Sportster of the dangers associated with operating the motorcycle when the kickstand is not fully retracted).)  This knowledge, along with a directive regarding the kickstand retraction of motorcycles sold in Europe, resulted in several meetings wherein Harley Davidson employees evaluated the design of the SSIS.  Although Harley Davidson ultimately decided not to utilize the system, several manufacturers in 1995 utilized the system.

Before I can determinate whether Harley Davidson owed a duty to Kagan, Kagan must clarify the theory on which he is proceeding.  If he is proceeding on the former theory, he must provide legal authority supporting the duty to exercise reasonable care in designing and manufacturing the motorcycle and the specific negligent acts which, if proved, would violate that duty.  If he is proceeding on the latter theory, he must analyze whether Harley Davidson had a duty to install the SSIS technology in 1995 using the five factors set forth in *Phillips* to determine whether a defendant owes such a duty of care to a plaintiff.  These factors include:  "(1) the relationship between the parties; (2) the social utility of the [defendant's] conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the [defendant]; and (5) the overall public interest in the proposed solution."  *See Phillips*, 841 A.2d at 1008 (citation and quotation marks omitted).  None of the factors is dispositive; "[r]ather, a duty will be found to exist where the balance of these factors weighs in favor of placing such a burden on a defendant."  *Id.* at 1008-09.  Therefore, all of the factors must be appropriately analyzed.

Kagan will have fourteen days from the date of the Order accompanying this Memorandum to file a supplemental brief addressing the theory of negligence and duty on which he is proceeding.  Harley Davidson will then have fourteen days from the date Kagan files his brief to file a responsive brief.[16]

---

[16] Harley Davidson asserts it is entitled to summary judgment on Kagan's strict liability and negligence claims because he assumed the risk of injury when he rode a motorcycle that he knew did not have SSIS technology and that had a deformed spring, which prevented the kickstand from fully retracting.  Under Pennsylvania law, assumption of the risk only applies in cases of strict liability, express assumption of the risk, and when preserved by statute.  *Kaplan v. Exxon Corp.*, 126 F.3d 221, 224-25 (3d Cir. 1997); *Howell v. Clyde*, 620 A.2d 1107, 1113 & n.10 (Pa. 1993) (plurality opinion); *Staub v. Toy Factory, Inc.*, 749 A.2d 522, 526 & n.6 (Pa.

**C.      Breach of Warranty Claim (Count III)**

In Count III, Kagan alleges that Harley Davidson breached its express and implied warranties that the motorcycle was free from defects and that it was safe and suitable for its intended uses.  Harley Davidson argues that it is entitled to summary judgment on the breach of warranty claims because the motorcycle was originally sold in 1995 and had seven owners prior to Kagan, so the warranties, which were conspicuously limited to one year, expired before Kagan purchased the motorcycle.

The owner's manual for the 1995 Harley Davidson Sportster provides:  "The duration of this limited warranty is twelve months, measured from the date of initial retail purchase from an authorized Harley-Davidson Dealer."  (Def. Mot. for Summ. J. Ex. O.)  If certain specified conditions are met, any unexpired portion of the warranty "may be transferred, with written authorization, upon the resale of the motorcycle/sidecar during the warranty period."  (*Id.*)  Under the heading "IMPORTANT/READ CAREFULLY," three disclaimers are listed, one of which provides:  "THERE IS NO OTHER EXPRESS WARRANTY (OTHER THAN EMISSIONS AND NOISE WARRANTIES) ON THE MOTORCYCLE.  ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS IS LIMITED TO THE DURATION OF THIS WARRANTY."  (*Id.*)

---

Super. Ct. 2000).  Assumption of the risk will only become relevant to Kagan's strict liability claim if I determine as a matter of law that the motorcycle is unreasonably dangerous.  Additionally, in a negligence claim brought under Pennsylvania law, the court considers whether the plaintiff assumed the risk as part of the duty analysis, not as an affirmative defense.  *Kaplan*, 126 F.3d at 225; *Staub*, 749 A.2d at 526.  Assumption of the risk will therefore only be relevant to Kagan's negligence claim as part of the duty analysis, which, as discussed above, requires more briefing from the parties before it can be analyzed.  Accordingly, I will not address the merits of the assumption of the risk doctrine before addressing the threshold matters discussed above.

Kagan contends that Harley Davidson is not entitled to summary judgment on this claim because, as he testified in his deposition (*see* Kagan Dep. 179:21-23), he never received a copy of the owner's manual that expressly limited the warranties.  The one-year express warranty Harley Davidson provided to the first purchaser of the motorcycle expired approximately ten years before Kagan filed this lawsuit.  Therefore, the original purchaser of the model year 1995 motorcycle would not now be able to sustain a claim for breach of express warranty.  It would be incongruous to allow Kagan to sustain a claim that the original purchaser of the motorcycle could not sustain merely because Kagan was not aware that the express warranty only lasted one year.

Furthermore, Kagan has not met the elements a third party must show in order to successfully sustain a claim a breach of express warranty.  The Pennsylvania Superior Court has determined that parties who did not purchase the product directly from the manufacturer "may enforce express warranties only under circumstances where an objective fact-finder could reasonably conclude that:  (1) the party issuing the warranty intends to extend the specific terms of the warranty to the third party (either directly, or through an intermediary); and (2) the third party is aware of the specific terms of the warranty, and the identity of the party issuing the warranty."  *Goodman v. PPG Indus., Inc.*, 849 A.2d 1239, 1246 (Pa. Super. Ct. 2004).  First, as evidenced by the language of the express warranty, Harley Davidson only intended to extend it to parties other than the original purchaser if it was appropriately transferred *before* it expired.  Second, Kagan admitted that he never saw the owner's manual with the express warranty.  (*See* Kagan Dep. 179:21-180:24; Pl. Mem. in Opp'n to Summ. J. 17.)  Clearly, then, he was not aware of the specific terms of the warranty.  Because Kagan has not pointed to evidence to support either element of the claim, he cannot sustain a cause of action for breach of express warranty.

18

Therefore, even if the express warranty had not expired (which it clearly had), Harley Davidson would still be entitled to summary judgment on Kagan's breach of express warranty claim.

Implied warranties are determined as a matter of law, and the Pennsylvania Supreme Court "has long held that, for breach of the implied warrant of merchantability, anyone injured by the defective product may sue, and anyone in the distributive chain may be sued." *Goodman*, 849 A.2d at 1245 (collecting cases).[17]  As Harley Davidson correctly states, implied warranties of merchantability and fitness can be excluded or modified.  Limitations on merchantability must reference merchantability, and if in writing must be conspicuous, and limitations on fitness must be in writing and conspicuous.  13 Pa. Cons. Stat. § 2316(b).  Whether exclusions or modifications are conspicuous is decided by the court as a matter of law.  *Borden, Inc. v. Advent Ink Co.*, 701 A.2d 255, 259 (Pa. Super. Ct. 1997).  The test in determining whether exclusions or modifications are conspicuous is whether a reasonable person should have noticed the warranty disclaimer.  *Id.*  Factors that can be considered when making this determination include:  (1) where the disclaimer is placed in the document, (2) the print size of the disclaimer, and (3) "whether the disclaimer was highlighted by being printed in all capital letters or in a type style or color different from the remainder of the document."  *Id.* (citing *Hornberger v. Gen. Motors Corp.*, 929 F. Supp. 884, 889 (E.D. Pa. 1996)).

Harley Davidson's written warranty disclaimer mentioned both the implied warranty of

---

[17] In its reply brief, Harley Davidson argues that it is entitled to summary judgment on the breach of implied warranty for merchantability claim because Martin's sale of the motorcycle to Kagan cannot create any implied warranties that are binding on Harley Davidson.  This argument is not correct; it has long been established that under Pennsylvania law, privity is not required for a plaintiff to hold a defendant liable for breach of implied warranties.  *See Kassab v. Cent. Soya*, 246 A.2d 848, 852-53 (Pa. 1968), *overruled on other grounds by AM/PM Franchise Ass'n v. Atl. Richfield Co.*, 584 A.2d 915 (Pa. 1990).

merchantability and the implied warranty of fitness.  Furthermore, the disclaimer was under an

all-capital-letter heading that drew the reader's attention to that section, and the disclaimer itself

was in all capital letters.  A reasonable person should have noticed this conspicuous implied

warranty disclaimer.  *Accord Hornberger*, 929 F. Supp. at 889 (concluding that a disclaimer was

conspicuous where, although it was in the middle of a thirty-seven-page manual, it was the only

writing in the book that was enclosed in a thick, dark-lined box and the disclaimer was printed in

boldfaced type).[18]

---

[18] Kagan does not address whether a reasonable person should have noticed the implied warranty disclaimer.  Rather, he contends that because he never received a copy of the warranty, he was not aware of the limitations on the implied warranty, and these limitations do not apply to him.  To support this argument, Kagan relies on *Moscatiello v. Pittsburgh Contractor's Equipment Co.*, 595 A.2d 1198 (Pa. Super. Ct. 1991), and *Spagnol Enterprises, Inc. v. Digital Equipment Co.*, 568 A.2d 948 (Pa. Super. Ct. 1989).  In *Moscatiello*, when the manufacturer sold a concrete spreading machine to Pittsburgh Contractors Equipment Company ("PCEC") the manufacturer was aware that PCEC was a mere conduit that was not going to use the machine and that Moscatiello, the third-party purchaser, was going to use the machine.  595 A.2d at 1198-1199.  It was unclear whether the manufacturer had given PCEC the warranty disclaimers.  *Id.* at 1199.  Furthermore, the manufacturer did not attempt to forward the warranty limitations and exclusions to Moscatiello, despite its knowledge that Moscatiello was the only party that was going to use the machine, and despite its direct contact with Moscatiello during negotiations.  *Id.* at 1199-1200.  The *Moscatiello* court concluded that the manufacturer's warranty disclaimer was not applicable to Moscatiello because (1) the express language of the exclusions clearly limited them to original purchaser, and (2) the manufacturer did not establish that the third-party purchaser received the express exclusions.  *Id.* at 1204.  Here, however,  Harley Davidson did not have direct contact with Kagan, the original purchaser of the motorcycle was not a mere conduit between Harley Davidson and Kagan, and there is no evidence that Harley Davidson failed to provide the warranty disclaimer to known purchasers.

    *Spagnol* is equally inapplicable here.  In *Spagnol* there was also an intermediary between the manufacturer and Spagnol, the third-party purchaser who at all times was the intended user of the product.  568 A.2d at 949.  In its contract with the intermediary, the manufacturer had disclaimed the implied warranty.  *Id.* at 952.  Spagnol sought damages from the intermediary for, inter alia, breach of implied warranty.  The court refused to apply these limitations to the breach of implied warranty suit between Spagnol and the intermediary because there was no written agreement between Spagnol and the intermediary and, thus, no actual disclaimer by the intermediary.  *Id.*  Here, Kagan is seeking damages from the manufacturer, not from an intermediary, and as discussed above, the fact that there was no direct relationship between

Because Harley Davidson's disclaimers were conspicuous, the time frame for bringing a breach of implied warranty claim expired one year from Harley Davidson's sale of the motorcycle. Thus, the first purchaser of the 1995 Harley Davidson Sportster could not have sustained a claim for breach of implied warranty that was filed in 2006. There were seven owners prior to Kagan, and Kagan purchased the motorcycle approximately nine years after the original purchase. (*See* Def. Undisputed Facts ¶ 45; Def. Mot. for Summ. J. Ex. F). To hold that Kagan is not limited by the warranty disclaimer merely because he was the eighth purchaser of the motorcycle and bought it from a private party who did not give him a copy of the owner's manual would give him more rights than the original purchaser had. This would hold Harley Davidson liable to Kagan even though it correctly disclaimed the implied warranties as it was required to do so under Pennsylvania law. Furthermore, it would require Harley Davidson to ensure that each subsequent purchaser, in sales over which it had no control and that took place over a nine-year period, received the disclaimers. As a matter of law, I will not place such a burden on manufacturers. Harley Davidson's motion for summary judgment on the breach of warranty claim will therefore be granted.

## IV.   Conclusion

The record before me and the arguments put forth by the parties are not sufficient to make the threshold determination that I am required to make as to whether the 1995 Harley Davidson Sportster is unreasonably dangerous without the SSIS technology. Because I must make this determination prior to trial, I will order the parties to provide supplemental briefing on this issue

---

Kagan and Harley Davidson does not automatically render Harley Davidson's warranty disclaimers inapplicable to Kagan.

21

before ruling on Harley Davidson's motion for summary judgment as to Kagan's strict liability claim.  Additionally, I will order supplemental briefing on the duty Kagan is asserting Harley Davidson owed him before ruling on Harley Davidson's motion for summary judgment as to Kagan's negligence claim.[19]

I will reserve judgment on the wrongful death claim until after the parties have provided supplemental briefing on the strict liability and negligence claims.  However, I will grant Harley Davidson's motion for summary judgment on the breach of express and implied warranty claims.

An appropriate order follows.

---

[19] Both parties agree that the kickstand in the 1995 Harley Davidson Sportster complies with the Federal Motor Vehicle Safety Standards.  In its reply brief, Harley Davidson summarily argued, for the first time, that the Federal Motor Vehicle Safety Standards preempt the entire field of motorcycle safety design and that it cannot be held liable for negligent design under state common law.  I will not consider Harley Davidson's argument on the issue at this time because Harley Davidson provided only conclusory arguments and because it did not raise the issue until its reply brief.  If Harley Davidson does in fact want to raise the issue of preemption, then it must do so in its supplemental briefing so that the argument can be fully developed and so Kagan has an opportunity to respond to this argument.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RICHARD KAGAN,                                          :
Individually and as Trustee *Ad Litem*,                :
   Plaintiff,                           :
                                                   :
   v.                                     :
                                                   :   CIVIL ACTION
HARLEY DAVIDSON, INC.,                                  :
A/K/A HARLEY-DAVIDSON MOTOR CO., INC.,                  :   NO. 07-0694
HARLEY-DAVIDSON MOTOR COMPANY                           :
GROUP, INC.,                                            :
BUELL MOTORCYCLE COMPANY,                               :
   Defendant.                           :
                                                   :

## Order

AND NOW on this _____ day of April 2008, upon consideration of defendant's motion for summary judgment (Document No. 29), plaintiff's response, and defendant's reply thereto, IT IS HEREBY ORDERED that:

1.     Harley Davidson, Inc.'s motion for summary judgment as to Richard Kagan's claims for breach of warranty (Count III) is GRANTED.  Judgment is entered in favor of Harley Davidson and against Kagan as to Count III.

2.     Harley Davidson shall file a supplemental brief within fourteen days of the date of this Order on Kagan's strict liability claim.  This brief shall set forth the undisputed facts and the disputed facts which are legally relevant (with citations to the record) and legal argument with reference to whether the 1995 Harley Davidson Sportster that does not include a Side Stand Interlock System is unreasonably dangerous.  If Harley Davidson chooses to pursue a claim of preemption, then it must address this argument in full in its supplemental brief, as well.  Richard Kagan shall file a responsive brief with reference to the same issues within fourteen days of the filing of Harley Davidson's supplemental brief.

3.     Richard Kagan shall file a supplemental brief within fourteen days of the date of this Order on his negligence claim.  This brief shall clarify the duty that Kagan is asserting Harley Davidson owed him regarding the design and manufacture of the 1995 Harley Davidson

Sportster.  Harley Davidson shall file a responsive brief on this issue within fourteen days of the filing of Kagan's supplemental brief.

    s/William H. Yohn Jr.
William H. Yohn Jr., Judge
