IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RICHARD KAGAN,
Individually and as Trustee *Ad Litem*,
    Plaintiff,

    v.

HARLEY DAVIDSON, INC.,
A/K/A HARLEY-DAVIDSON MOTOR CO., INC.,
HARLEY-DAVIDSON MOTOR COMPANY
GROUP, INC.,
BUELL MOTORCYCLE COMPANY,
    Defendant.

CIVIL ACTION

NO. 07-0694

**Memorandum and Order**

August 19, 2008

YOHN, J.

Richard Kagan, individually and as Trustee *Ad Litem*, brings this lawsuit against

defendant Harley Davidson, Inc., asserting claims of strict liability, negligence, and breach of

express and implied warranties in connection with his own injuries, and wrongful death on the

same theories in connection with the death of his wife. Harley Davidson has filed counterclaims

for negligence and negligence per se. On April 22, 2008, the court granted Harley Davidson's

motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to the express

and implied warranty claims and ordered supplemental briefing on the strict liability and

negligence claims. *See Kagan v. Harley Davidson, Inc.*, No. 07-0694, 2008 WL 1815308 (E.D.

Pa. Apr. 22, 2008). The parties subsequently provided additional briefing as requested. For the

reasons discussed below, the court will now grant Harley Davidson's motion for summary

judgment as to the strict liability claim and deny it as to the negligence claim.

*1*

## I.   Factual and Procedural Background[1]

The prior Memorandum and Order set forth a detailed recitation of the facts underlying this lawsuit. *See id.* at *1-4. This section will therefore only address the facts relevant to the disposition of the strict liability and negligence claims.

This case arises from a June 26, 2004 single-motorcycle accident involving Kagan's 1995 Harley Davidson Sportster. The accident took place while Kagan was driving and his wife, Janet Martin, was riding as a passenger. Kagan bases the lawsuit on the theory that Harley Davidson defectively and negligently designed and manufactured the 1995 Sportster because it did not incorporate a Side Stand Interlock System ("SSIS") into the kickstand that would have shut off the motorcycle's engine if the kickstand was not fully retracted during operation.[2] At some point prior to the accident, the spring in Kagan's kickstand was bent, which prevented the kickstand from resting flush against the motorcycle's bumper. The evidence demonstrates that because the

---

[1] The account contained in this section is comprised of both undisputed facts and Kagan's factual allegations, and all facts and inferences are viewed in the light most favorable to Kagan, the nonmoving party. *See Brown v. Muhlenberg Twp.*, 269 F.3d 205, 208 (3d Cir. 2001) (citing *Beers-Capitol v. Whetzel*, 256 F.3d 120, 130 n.6 (3d Cir. 2001)). Harley Davidson's statement of the facts is cited only where Kagan has specifically admitted that this version of the facts is undisputed.

[2] Although the parties interchangeably use the terms "kickstand," "side stand," and "jiffy stand," the court will only refer to the mechanism as the "kickstand." The previous opinion described how the kickstand functions:

> The kickstand is comprised of a bracket or yoke, a kickstand leg, and a spring. When the motorcycle is in operation, the spring holds the kickstand leg in the fully retracted (up) position, flush against the motorcycle's rubber bumper. When the motorcycle is not in operation, the kickstand is placed in the fully deployed (down) position and holds the motorcycle upright. The kickstand is designed to move easily rearward and upward toward the fully retracted position when the weight of the motorcycle is not resting on the stand.

*Kagan*, 2008 WL 1815308, at *1 n.3.

kickstand did not fully retract, it may have released and hit the roadway immediately before the accident. Kagan asserts that if Harley Davidson would have designed and manufactured the motorcycle with an SSIS, he would have been aware that the kickstand was not fully retracted because the engine would have shut off, and the accident would not have occurred.

Kagan bought the 1995 Sportster from his wife's son and his stepson, Adam Martin, in May or June 2004. (Dep. of Richard K. Kagan 175:17-176:14, July 17, 2007; Dep. of Adam Martin 21:6-25, Aug. 16, 2007.)[3] The Harley Davidson service manual Martin gave Kagan when he delivered the motorcycle to Kagan (Kagan Dep. 179:8-12), included the following warning:

> Be sure jiffy stand is fully retracted before riding. If jiffy stand is not fully retracted during vehicle operation, unexpected contact with the road surface can distract the rider. While the jiffy stand will retract upon contact, the momentary disturbance and/or rider distraction can lead to loss of vehicle control resulting in personal injury and/or vehicle damage.

(D. Mot. for Summ. J. Ex. C). The service manual also provided instructions on how to care for the motorcycle's kickstand and included a close-up photograph depicting how the kickstand appears when it is fully retracted. (*Id.*) The instructions in the manual further explained that "[i]n retracted position (up), jiffy stand leg should be securely seated against frame-mounted rubber bumper." (*Id.*)

Kagan attended a Basic Motorcycle Rider Course offered by the Pennsylvania Department of Transportation, and he completed this course on June 19, 2004. (Def.'s

---

[3] Seven individuals owned Kagan's 1995 Sportster prior to Kagan, and Kagan purchased the motorcycle approximately nine years after the original purchase. (Def. Undisputed Facts ¶ 45; Def. Mot. for Summ. J. Ex. F.) The motorcycle was stolen from the original owner at one point, but it was subsequently recovered. (Def.'s Supplemental Br. on Strict Liability 3, ¶ 22.) There is no record of the subject motorcycle being in any accident prior to Kagan's accident. (*Id.* at 7, ¶ 50.)

Supplemental Br. on Strict Liability 1, ¶ 2.) During this course, Kagan learned that he should conduct a preride check of the motorcycle prior to each use of the motorcycle and that a component of this check included inspecting the motorcycle's kickstand. (*Id.* at 1, ¶ 3.)

The 1995 Sportster was in the same condition on the day of the accident as it was on the day Martin delivered it to Kagan. (Kagan Dep. 201:14-18.) Kagan did not inspect the kickstand to determine its condition prior to the accident, and he did not know that the spring on the kickstand was bent or that the kickstand sagged down. (*Id.* at 204:1-21, 359:8-360:8.)

The accident took place on June 26, 2004 while Kagan and his wife were traveling on Route 10 on their way from Montgomeryville, Pennsylvania to Lancaster, Pennsylvania. (*Id.* at 257:21-258:7, 359:3-8.) Kagan lost control of the motorcycle while navigating a curve to the left, the motorcycle left the roadway as Kagan exited the curve, and Kagan and his wife were thrown from the motorcycle. (Pl. Statement of Facts ¶ 30.) Kagan does not remember the accident, what caused him to lose control of the motorcycle, or whether the kickstand touched the roadway prior to the accident. (Kagan Dep. 266:2-16, 288:1-12, 297:3-10.) He suffered serious injuries from the accident, and his wife died from the injuries she sustained. (Pl. Statement of Facts ¶ 30.)

Scott King, Kagan's expert witness, concluded that the spring in the kickstand was bent after Harley Davidson had manufactured and marketed the 1995 Sportster, but prior to Kagan's accident. (Dep. of R. Scott King 141:13-16, 340:7-10, 340:18-23, 347:10-21, Oct. 22, 2007.) He also concluded that the bent spring prevented the kickstand from fully retracting, and if the spring had not been bent, the kickstand would have fully retracted. (*Id.* at 141:17-142:11.) To test the angle at which the kickstand sagged, King manually held the kickstand up against the bumper

4

and then dropped it. (*Id.* at 308:2-6, 342:1-12, 343:16-19.) He "eyeballed" the angle and
estimated that the kickstand sagged between twenty-two and one-half degrees to thirty degrees
off of the bumper. (*Id.* at 343:8-15.)[4] King tested the operation of the kickstand and concluded
that other than the sagging due to the bent spring, the kickstand operated correctly and was not
defective. (*Id.* at 198:7-199:2, 340:11-17.)

Based on witnesses' statements[5] and the evidence of scraping on the tip of the kickstand,
King determined that Kagan's kickstand came into contact with the ground during the accident.
(*Id.* at 142:12-143:6.) He opined that the kickstand would not have touched the ground if the
spring had not been bent. (*Id.* at 143:7-13.)

King concluded that the absence of an SSIS contributed to Kagan's accident because if
one had been in place, it would have sensed the sagging kickstand and would have "notified"
Kagan that there was a problem with the motorcycle. (*Id.* at 405:17-12, 406:6-12.)[6] King opined
that any motorcycle made from 1995 onward that did not have an SSIS associated with the

---

[4] This sag was approximately one inch past the three-quarters of an inch sag that was
observed in the photographs of the 1995 Sportster taken after the accident. (*Id.* at 308:7-22.)

[5] Matthew and Julianna Fuellner were traveling directly behind Kagan at the time of the
accident. (Dep. of Julianna Fuellner 33:16-22, Sept. 19, 2007.) Both of the Fuellners observed
that the kickstand was hanging down approximately three-quarters of the way off the
motorcycle's bumper prior to the accident. (*Id.* 43:18-24, 60:13-14; Dep. of Matthew Fuellner
25:4-7, Sept. 19, 2007.) Mrs. Fuellner initially testified in her deposition that she saw the
kickstand contact the roadway during the accident, but at two later times during the deposition,
she testified that she did not observe the kickstand contact the roadway. (J. Fuellner Dep. 9:10-
15, 54:21-22, 60:5-9.) Mr. Fuellner testified that he did not see the kickstand contact the
roadway, but that while speaking with an officer at the scene, he observed a gouge in the
highway at the location where the motorcycle first started to leave the highway. (M. Fuellner
Dep. 12:7-15, 25:10-15.)

[6] King also concluded that the kickstand contacting the roadway and Kagan's speed were
additional factors that contributed to the accident. (King Dep. 143:14-21, 399:20-400:1.)

kickstand is a defective product. (*Id.* at 139:16-140:2, 385:13-21.) He further explained that a motorcycle without an SSIS is a defective product because of the risk of crash, loss of control, or injury that could occur if the kickstand contacts the ground during the motorcycle's operation. (*Id.* at 140:3-5.)[7]

King did not identify a particular type of SSIS that should be installed on the 1995 Sportster, but he explained how the system should work. (*Id.* at 358:11-359:2, 359:2-4.) In his opinion, the SSIS should have a plunger switch to sense when the kickstand is fully retracted at a flush position against the bumper. (*Id.* at 359:9-21.) If the kickstand sags to a predetermined angle while the operator is driving the motorcycle, the switch activates the SSIS. (*Id.* at 374:9-375:7.) The SSIS then provides an interrupt signal to the ignition circuit and a grounding signal to the tachometer circuit in the ignition and interrupts the ignition or firing of the spark plugs. Thus, the SSIS shuts the engine off if the kickstand partially deploys while the transmission is in gear. (*Id.* at 359:9-21, 360:1-4.) King approximated that the SSIS should activate when the kickstand is deployed approximately a quarter of an inch or one-half of an inch. (*Id.* at 360:11-17.)

---

[7] King noted that there would not necessarily be an accident or loss of control and the driver may not even notice every time the kickstand contacts the roadway. (King Dep. 140:6-20, 327:17-20.) He also testified that, assuming the kickstand hit the ground on the day of Kagan's accident, it was possible that this did not cause the accident. (*Id.* at 327:5-20.) He noted that it was possible that if Kagan's motorcycle had an SSIS, if the SSIS had activated while Kagan was navigating the curve, this also could have contributed to an accident. (*Id.* at 391:1-7.) King opined, however, that this possibility was unlikely because if the SSIS worked properly, it would have notified Kagan there was a problem with the kickstand prior to the curve. (*Id.* at 391:8-14, 392:3-10.) He further explained that he did not know if an SSIS would have actually prevented Kagan from operating the motorcycle on the day of the accident, but he was certain that Kagan would have been aware there was a problem with his 1995 Sportster if there had been an SSIS on the motorcycle. (*Id.* at 398:12-19.)

King acknowledged that an SSIS could result in the engine being shut off while the operator was driving at highway speeds, and that if an SSIS completely cuts off the engine, loss of control and an accident could result. (*Id.* at 374:17-375:1, 389:10-18, 390:7-18.) He also acknowledged that in general, this can be a safety hazard and is not "desirable." (*Id.* at 390:19-23.) Alternatively, King explained that if the kickstand is bouncing up and down, when it bounces down it could activate the SSIS and cut off the engine, and when it bounces back up, it could deactivate the SSIS and restart the engine, causing a "hiccup." (*Id.* at 375:8-376.19.) King acknowledged that this hiccup could also distract the operator and cause an accident that could result in death, but he opined that an accident due to a hiccup is less likely than an accident due to one of the motorcycle parts coming into contact with the roadway. (*Id.* at 376:20-378:20.)

Thomas Carter, Harley Davidson's expert, examined Kagan's 1995 Sportster and concluded that the kickstand retraction mechanism functioned properly, but the kickstand did not retract fully. He estimated that the kickstand retracted to approximately three-fourths of an inch from the motorcycle's rubber bumper. (Def.'s Reply Ex. P, Report of Thomas Carter ¶¶ 60.50.6, 60.50.10, Sept. 10, 2007 ("Carter Report").) This resulted in a seven degree sag. (*Id.* ¶ 60.50.6.) After examining the damage patterns on the kickstand and the location of the damage, Carter concluded that the damage to the kickstand's spring occurred prior to Kagan's accident. (*Id.* ¶ 6.52.)

Carter determined that the bent spring in Kagan's motorcycle sometimes caused the kickstand to contact the ground during left turns. (Dep. of Thomas J. Carter 102:9-15, Dec. 19, 2007.) According to Carter, this contact did not cause any disturbance to the motorcycle or the operator. (*Id.* at 102:16-103:4.) He also opined that the kickstand may have contacted the

7

roadway while Kagan was navigating the curve immediately prior to the accident, but there was no evidence that this contact disturbed the motorcycle. (*Id.* at 60:22-61:8.) He explained that a kickstand's partial deployment, or sagging, would only cause a disturbance when it touched the ground if there was a binding system on the kickstand that did not allow the kickstand to retract. (*Id.* at 78:2-24.) He explained that the kickstand on the 1995 Sportster has one of the best retraction mechanisms available because it is a weight-bearing stand, and once the weight is removed from the kickstand, it requires very little effort for the kickstand to fold upward because it is an almost automatically folding stand. (*Id.* at 79:24-80:12, 80:20-80:4, 81:1-4.)

Carter testified that an SSIS is typically installed to prevent drivers from riding away with the kickstand fully deployed or to prevent the motorcycle's operation when the kickstand is deployed near the center point, when the kickstand's contact with the roadway would disturb the motorcycle. (*Id.* at 77:11-23.) Because the kickstand in the 1995 Sportster is a weight-bearing stand, there are no problems with operators driving away with the kickstand deployed. (*Id.* at 80:22-24.)[8]

Carter also summarized the results of tests he conducted on twenty-two motorcycles to determine at what angle of deployment the SSIS either turns off the engine or prevents the engine from starting. (Carter Report ¶ 13.1.) Of the motorcycles tested, four of them had an SSIS that engaged when the deployment angle was approximately ten to fifteen degrees, one motorcycle was equipped with an SSIS that engaged at approximately fifty degrees, four motorcycles had an

---

[8] Harley Davidson contends that the kickstand's design and operation comply with all Federal Motor Vehicle Safety Standards and the Society of Automotive Engineers Standards. King did not find any area where the kickstand's design or operation did not comply with these standards. (Pl.'s Supplemental Br. on Strict Liability 2-3, ¶ 18.)

SSIS that engaged at approximately sixty to seventy degrees, and ten motorcycles had an SSIS that engaged at approximately eighty to ninety degrees. (*Id.* ¶¶ 13.3.1-13.3.22.) Three of the motorcycles tested were not equipped with an SSIS, one because it had been removed by a prior owner, and the other two because the motorcycle had a rubber retraction assist device. (*Id.* ¶¶ 13.3.9, 13.3.11, 13.3.16.) None of these twenty-two motorcycles was manufactured by Harley Davidson.

## II.   Legal Standard

Either party to a lawsuit may file a motion for summary judgment, and it will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996) (citation omitted).  Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-

9

movant is to be believed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Furthermore, "[a]ll justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy*, 90 F.3d at 744 (citation omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) (citation omitted). The nonmovant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production; the nonmovant must present concrete evidence supporting each essential element of its claim. *Anderson*, 477 U.S. at 252; *Celotex*, 477 U.S. at 322-23.

## III.   Discussion

### A.   Strict Liability Claim

Kagan brings a claim for strict liability against Harley Davidson in Count I.  He asserts that Harley Davidson defectively designed and manufactured the 1995 Sportster because the kickstand's design did not include an SSIS, and this rendered the motorcycle unreasonably dangerous for its intended use.[9]

As both parties acknowledge, Pennsylvania law governs this diversity case.  Pennsylvania

---

[9] Although Kagan's Complaint included a claim based on a manufacturing defect, the parties did not address this claim in their original briefs or in the supplemental briefs.  Courts apply the same risk-utility analysis to both design defect and manufacturing defect claims.  *See Lancenese v. Vanderlans & Sons, Inc.*, No. 05-5951, 2007 WL 1521121, at *2-3 (E.D. Pa. May 21, 2007).  Thus, for the same reasons that Harley Davidson's motion for summary judgment on Kagan's design defect claim will be granted, it will also be granted on the manufacturing defect claim.

law follows section 402A of the Second Restatement of Torts for strict liability claims.[10] *Webb v. Zern*, 220 A.2d 853, 854 (1966). Under Pennsylvania law, a plaintiff may bring a strict liability claim premised on the theory that the product was defectively designed. *Azzarello v. Black Bros. Co.*, 391 A.2d 1020, 1022 (Pa. 1978). To prevail on such a claim, "the plaintiff must prove (1) that the product was defective, (2) that the defect existed when it left the hands of the defendant, and (3) that the defect caused the harm." *Riley v. Warren Mfg., Inc.*, 688 A.2d 221, 224 (Pa. Super. Ct. 1997) (citing *Ellis v. Chi. Bridge & Iron Co.*, 545 A.2d 906, 909 (Pa. Super. Ct. 1988)).

In Pennsylvania, the threshold determination in strict liability claims for defective design is whether the product is "unreasonably dangerous." *Moyer v. United Dominion Indus., Inc.*, 473 F.3d 532, 538 (3d Cir. 2007); *Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1042 (3d Cir. 1997); *Azzarello*, 391 A.2d at 1026; *Riley v. Warren*, 688 A.2d at 224. The judge makes this determination prior to trial. *Moyer*, 473 F.3d at 538; *Surace*, 111 F.3d at 1049 n.10. When determining whether a product is unreasonably dangerous, the judge must "engage in a risk-utility analysis, weighing a product's harms against its social utility." *Surace*, 111 F.3d at 1044. This risk-utility analysis determines "whether a product's condition justifies placing the risk of loss on the supplier." *Id.* at 1042. "[T]he question for the court to determine is whether the evidence is sufficient, for purposes of the threshold risk-utility analysis, to conclude as a matter

---

[10] The relevant provision of Section 402A provides:
>  (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm thereby caused to the ultimate user or consumer . . . , if
> > (a) the seller is engaged in the business of selling such a product, and
> > (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

of law that the product was not unreasonably dangerous, not whether the evidence creates a genuine issue of fact for the jury." *Id.* at 1049 n.10.

Pennsylvania courts and the Third Circuit have identified seven factors that judges may consider when engaging in this analysis:

> (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole; (2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury; (3) The availability of a substitute product which would meet the same need and not be as unsafe; (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) The user's ability to avoid danger by the exercise of care in the use of the product; (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instruction; and, (7) The feasibility, on the part of the manufacturer, of spreading the loss of [sic] setting the price of the product or carrying liability insurance.

*Id.* at 1046 (quoting *Dambacher v. Mallis*, 485 A.2d 408, 423 n.5 (Pa. Super. Ct. 1984)); *see also Riley v. Warren*, 688 A.2d at 224-25. The judge determines whether a product is unreasonably dangerous "under a weighted view of the evidence, considering the facts in the light most favorable to the plaintiff." *Moyer*, 473 F.3d at 538 (citing *Phillips v. A-Best Prod. Co*, 665 A.2d 1167, 1171 n.5 (Pa. 1995)).

If the judge determines as a matter of law "that the risk-utility balance so favor[s] the manufacturer that the [product] could not be deemed unreasonably dangerous," then the claim does not go to the jury. *Surace*, 111 F.3d at 1048. On the other hand, "[i]f the judge concludes that a product is 'unreasonably dangerous' the case is submitted to the jury, which then decides, based on all the evidence presented, 'whether the facts of the case support the averments of the complaint.'" *Moyer*, 473 F.3d at 538 (quoting *Azzarello*, 391 A.2d at 1026). "[T]he jury

considers whether the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." *Id.* at 532 (internal quotation marks and citations omitted).

The parties did not address adequately whether the 1995 Sportster is unreasonably dangerous in their original memorandums. Because the judge must make this determination prior to trial, I ordered supplemental briefing on the issue. As Harley Davidson correctly notes in its supplemental brief, the focus for this analysis is whether the 1995 Sportster was unreasonably dangerous at the time it was marketed, not whether it was unreasonably dangerous at the time of the accident. *See Surace*, 111 F.3d at 1053 ("This threshold analysis focuses on the condition of the product at the time it is marketed . . . .").[11] Both parties agree that the spring in the kickstand was not bent at the time it left Harley Davidson's control—i.e., at the time it was marketed. (Def.'s Supplemental Br. on Strict Liability 4, ¶¶ 23-24; Pl.'s Supplemental Br. on Strict Liability 3, ¶¶ 23-24.) Thus, the risk-utility analysis focuses on whether a 1995 Sportster with a kickstand that is not bent but that does not contain an SSIS is unreasonably dangerous.[12]

---

[11] Despite correctly recognizing this point, in some of its arguments Harley Davidson focuses on the bent spring as the defect at issue and argues that under Kagan's theory of the case, the bent spring caused the accident. The arguments that focus on the bent spring as causing the accident are not relevant to whether the motorcycle was unreasonably dangerous because Kagan's theory is that the lack of an SSIS, not the kickstand spring, was the design defect. Furthermore, causation cannot be weighed by the trial court "as a factor in resolving the legal question of risk allocation," *Surace*, 111 F.3d at 1053, so whether the bent spring or the lack of an SSIS caused the accident is not relevant to the threshold determination of whether the 1995 Sportster is unreasonably dangerous without an SSIS.

[12] As a threshold matter, Harley Davidson asserts that it is entitled to summary judgment on Kagan's strict liability and negligence claims because the undisputed facts show that there was no commercially available SSIS technology that would have prevented Kagan's accident. King concluded that the kickstand sagged to approximately one and three-quarters inches, or to an angle somewhere between twenty-two and one half degrees and thirty degrees. (King Dep.

*13*

### 1.   Utility of the 1995 Sportster to Kagan and to the public as a whole.

The first factor includes an analysis of the usefulness and desirability of the 1995 Sportster, including its utility to Kagan and to the public as a whole. Kagan concedes that the 1995 Sportster is a useful product, but argues that this factor weighs in his favor because the 1995 Sportster would have more utility if it had an SSIS. The applicable case law, however, shows that the analysis under this factor does not compare the product as designed to the product as the plaintiff proposes. In *Surace*, a construction worked brought a strict liability claim against the manufacturer of a pavement profiler after his foot was backed over by the profiler. The plaintiff argued that the profiler was unreasonably dangerous because it did not include a lockout/tagout device, which would have prevented the profiler's operator from reversing the profiler unless it was activated by ground crew. The Third Circuit concluded that "[t]he profiler is, of course, useful and desirable," demonstrating that the analysis was whether the profiler as it was actually designed and manufactured had any utility. *See Surace*, 111 F.3d at 1053. Thus, the correct focus of the first factor in Kagan's claim is whether the 1995 Sportster as it was actually designed and manufactured by Harley Davidson was useful and desirable; not whether the proposed changes would increase the product's utility. *See id*; *see also Epler v. Jansport, Inc.*, No. 00-154, 2001 WL 179862, at *3 (E.D. Pa. Feb. 22, 2001) (concluding that the utility of the product as a whole is the relevant focus of the first factor, not the utility of any allegedly

---

308:2-6, 342:1-12, 343:8-19.) Carter concluded that the kickstand sagged to three-fourths of an inch, or to a seven degree angle. (Carter Report ¶ 60.50.) Viewing the disputed facts in the light most favorable to Kagan, the evidence demonstrates that during operation, the kickstand sagged to up to thirty degrees. There is evidence in the record of SSIS technology that activated at angles less than thirty degrees, so Harley Davidson is not entitled to summary judgment on this basis.

defective parts, and collecting cases that have reached the same conclusion). Therefore, Kagan's theory that the 1995 Sportster would have more utility and would be more desirable if it contained an SSIS is not applicable.[13] Moreover, even if the factor looked at the motorcycle with the SSIS, it clearly would have utility to the public.

Harley Davidson asserts that the 1995 Sportster is unquestionably useful and desirable as a convenient and efficient method of transportation and as a recreational vehicle. Harley Davidson points out that Kagan voluntarily purchased the 1995 Sportster and that multiple owners used the 1995 Sportster over a nine-year period, all evidencing the 1995 Sportster's utility. Other courts have concluded that repeated use of a product is evidence of its utility. *See, e.g., Short v. WCI Outdoor Prods., Inc.*, No. 99-3526, 2000 WL 1659938, at *5 (E.D. Pa. Nov. 2, 2000). The court agrees that Kagan's voluntary use of the 1995 Sportster and previous owners' use of the motorcycle over a nine-year period evidences that it is a useful and desirable product.

---

[13] Kagan relies on *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1009 (Pa. 2003), to support his argument that even thought the 1995 Sportster is a useful product, the utility factor weighs in his favor because if the 1995 Sportster had an SSIS, it would have a greater social utility. In the portion of *Phillips* that Kagan relies on, the Pennsylvania Supreme Court was analyzing the duty prong of the plaintiff's negligence claim, specifically the factor that required looking at the social utility of the defendant's conduct, to determine whether the defendant owed a duty of care to the plaintiff. *Id.* at 1008-09. The court found that this factor weighed in favor of the plaintiff because if the defendant had produced the product at issue with an additional safety feature—a device that would prevent small children from using the product—the defendant's conduct would have had a greater utility. *Id.* at 1009. The *Phillips* court's reasoning is not applicable here because the court was analyzing the defendant's conduct under a negligence claim, and not the product itself under a strict liability claim. As the *Phillips* court explained, "negligence and strict liability are distinct legal theories. Strict liability examines the product itself, and sternly eschews considerations of the reasonableness of the conduct of the manufacturer. . . . In contrast, a negligence cause of action revolves around an examination of the conduct of the defendant." *Id.* at 1008 (internal citation omitted). The court also explained that "the elements of the causes of action are quite distinct." *Id.* Accordingly, the analysis of the utility of a defendant's conduct under the negligent design claim in *Phillips* is not applicable to analysis of the utility of the product itself under Kagan's strict liability claim.

15

This factor therefore weighs in Harley Davidson's favor.

### 2.    The likelihood that the 1995 Sportster will cause injury, and the probable seriousness of any injury caused.

The second factor requires looking at the safety aspects of the 1995 Sportster and focuses on the likelihood that the 1995 Sportster will cause injury and the probable seriousness of any injury caused. The analysis under this factor looks at the likelihood the 1995 Sportster will cause injury when it is in the condition it was in when it was marketed; thus, its condition immediately prior to the accident, which took place years after it was marketed, is not relevant. *See Surace*, 111 F.3d at 1053.

Kagan contends that the likelihood of a sagging kickstand coming into contact with the roadway increases during left-hand turns, which in turn increases both the probability of injury and the seriousness of the injury. Kagan further argues that because a motorcycle accident can result in serious bodily injury or death, this factor weighs in his favor.[14] Kagan's arguments center on accidents that would take place if the kickstand sagged. However, for purposes of the strict liability analysis, the relevant inquiry is the likelihood of accidents actually occurring and the seriousness of injury resulting from those accidents based on the condition of the 1995 Sportster as it was marketed—based on a motorcycle that does not have a sagging kickstand. *See Surace*, 111 F.3d at 1053. Thus, Kagan's arguments on this factor are not persuasive because

---

[14] Kagan also argues that because Harley Davidson warned users of the risks inherent in driving a motorcycle with the kickstand not fully retracted, it necessarily recognized the likelihood and seriousness of injuries. The warnings address whether an accident was foreseeable, and the foreseeability of injury is not an appropriate consideration for strict liability claims. As the Pennsylvania Supreme Court has explained, "strict liability affords no latitude for the utilization of foreseeability concepts." *Phillips*, 841 A.2d at 1006. Because foreseeability cannot be considered, as discussed below, courts have looked at the actual rate of injury when analyzing this factor.

16